IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| PERVEZ SHAIKH, ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| ) | Civil Action No.: 1:07cv1036 |
| v. ) | |
| ) | |
| LOUDOUN COUNTY, VIRGINIA, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

### I. Introduction

The Plaintiff Pervez Shaikh ("Plaintiff") brings this Title VII discriminatory discharge civil rights action against his previous employer, Loudoun County, Virginia ("Loudoun County"). Plaintiff asserts that Loudoun County illegally terminated him from his employment for discriminatory reasons based on his Pakistani national origin. This matter comes before the court on a Motion for Summary Judgment filed by Loudoun County. This motion has been fully briefed and argued, and the court finds that there are no material facts in dispute, and the case can be decided on the summary judgment motion. For the reasons that follow, the Court holds that Plaintiff is not entitled to relief under 42 U.S.C. § 2000e *et seq.* and Loudoun County's Motion for Summary Judgment is accordingly granted.

### II. Background

**1. Plaintiff's Background, Education, and Employment History**

Loudoun County hired Plaintiff, who is of Pakistani national origin, as a Senior Public

1

Works Engineer III in August, 2005, at which time he began his probationary employment period. Plaintiff's educational background began with a bachelor of science degree in chemistry from the University of Sind, Pakistan. Plaintiff also earned a masters of engineering degree in desalination technology from the University of Glasgow. As examples of Plaintiff's work experience, prior to Plaintiff's employment in Loudoun County, Plaintiff supervised a large scale construction project of a desalination plant, and acted as engineering supervisor where he coordinated activities in several countries during which, the individuals responsible for the specific day to day details of the work performed reported to Plaintiff.

**2. Loudoun County Department of General Services**

The Loudoun County Department of General Services handles various major repair and renovation projects in the County. While the Department of General Services is comprised of approximately 120 employees, Plaintiff's group within these 120 employees consisted of five other employees. Specifically, Jay Snyder ("Snyder") is the Director of the Department of General Services. Under Snyder is Richard Pezzullo ("Pezzullo"), the Deputy Directory of the Department of General Services. Further down the chain of command is the Chief of Design and Construction which was filled on an interim basis by Richard Foster ("Foster") from August, 2005 to November, 2005. The full time position of Chief of Design and Construction was filled by David Weber ("Weber") in December, 2005. Foster and Weber, as the Chief of Design and Construction supervised three individuals, Plaintiff, Frank Lawrence, and John Hillis who were all Senior Public Works Engineer III.

The responsibility of a Senior Public Works Engineer III ("project manager") was to accomplish facilities maintenance and repair projects in Loudoun County. More specifically the

project manager analyzed each particular project usually beginning with a visit to the project site. During the visit, the project manager assessed which components would be involved in the project to determine whether the project manager would require technical guidance to complete the project, and possibly consult with professional consultants for design ideas. After the on site visit, the project manager created a scope of work document. This document would eventually develop into a contractual document. The project manager also calculated an estimated cost of the project, generated a procurement request, and obtained a requisition from the county to make sure that the appropriate amount of money was available for the project. Next, the information would go to a construction contractor for bidding and pricing in the form of an invitation for bid. The project manager also obtained building permits and oversaw the project during construction.

Pezzullo conducted biweekly meetings with Plaintiff, Lawrence, and Hillis, and daily meetings with the Chief of Design and Construction who was first Foster on an interim basis, then Weber after Weber was hired on full time in December, 2005. The purpose of the meetings was to ensure that Pezzullo was informed of the current activities of the department and to resolve any issue that may have arisen. Each project manager submitted the documents they prepared in connection with each project to the Chief of Design and Construction. The Chief of Design and Construction would then mark up the documents with changes and discuss any omissions or adjustments with the project manager.

### 3. Probationary Employees

Loudoun County uses a probationary employee period to assess an employee's skills and to determine whether the employee would be suitable for long-term employment with the county. The probationary period is "a fixed period of time and begins the first day of

employment with the County and is twelve months in duration." (Pl.'s Ex. B.) The Loudoun County Human Resources Handbook contains the following further information with regard to probationary employees:

> "The appointments of probationary employees may be terminated by the County at any time during their employment. No reason is required for the termination and none must be given. Probationary employees may be terminated immediately or, at the discretion of the Department Head...
>
> Termination of employment is the typical action for misconduct or unsatisfactory performance by probationary employees. If managers choose, instead, to warn, reprimand, suspend without pay, or demote a probationary employee for conduct or performance problems, the procedural requirements in Sections 10.1 - 10.3[1] do not apply and the probationary employee has no right to appeal such actions through the grievance procedures." (Pl.'s Ex. B).

**4. Plaintiff's Work Environment**

Between August, 2005, the beginning of Plaintiff's probationary employee period, and November, 2005, Foster supervised Plaintiff. Foster and Plaintiff were friendly with each other at work. They shared a common bond because they both drank decaffeinated coffee. Foster and Plaintiff would take turns purchasing the coffee supplies and became "coffee buddies." (Pl.'s Dep. 54:6-18, April 16, 2008). While Foster held Plaintiff's interpersonal skills in high regard, Plaintiff was having difficulty with his work performance during his probationary period.

On December 5, 2005, Foster wrote a memo to the file regarding Plaintiff and his performance as a project manager. Foster noted that Plaintiff was friendly and outgoing with staff and peers, he was respectful in his dealings with supervisors and co-workers, and he was punctual and followed proper leave procedures. Foster also indicated that Plaintiff had difficulty

---

[1] Section 10.1 is Disciplinary Authority, 10.2 is Warning and Discipline of Regular Employees for Misconduct, and 10.3 is Warning and Discipline of Regular Employees for Unsatisfactory Performance.

with his project management skills, more specifically that Plaintiff had difficulty transferring his large scale project management experience to the smaller projects undertaken by Loudoun County. It appeared that in the past, Plaintiff had a staff of people and consultants who conducted a detailed determination of the project requirements and Plaintiff relied on them to get the project executed. However, the projects Plaintiff was assigned in Loudoun County required a more basic understanding, on Plaintiff's part, of what was required to complete the project. Foster wrote that if Plaintiff didn't make considerable improvements during his probationary employment period, that Plaintiff should be reassigned to a lower grade position or removed from the position.

Plaintiff was not the only project manager in the Department of General Services who had problems with their performance. There were also some concerns with another project manager, Frank Lawrence ("Lawrence"). Foster had a talk with Lawrence about the problems and Lawrence's performance improved after that discussion.

After Weber was hired as Chief of Design and Construction in December 2005, Weber became Plaintiff's supervisor. During the next several months of Weber's supervision of Plaintiff, Weber observed the same continuing issues with Plaintiff's work. Weber noted that Plaintiff had difficulty understanding the type of work that was required to repair the facilities for which he was responsible. Additionally, Plaintiff's reports to Weber often required additional work by Weber because plaintiff inadvertently omitted the requisite work code numbers and pertinent information, but then included other unnecessary information.

On February 15, 2006, Weber met with Plaintiff and wrote a memo to the file regarding the conversation. Weber indicated that Plaintiff's previous work experience with projects on a

large scale level had not prepared Plaintiff for the detail required for the project manager position. Plaintiff required detailed discussions and direction which created a burden on Weber as his supervisor. Weber also noted that Plaintiff fit in well with the department, had excellent people skills, and that Plaintiff expressed a desire to continue to work to try to perform at the level that was expected of him as project manager.

On May 15, 2006, Weber wrote a follow up memo to the file on Plaintiff's performance which was still at a level that was below the requirements of a project manager. Plaintiff continued to require detailed direction and instruction from Weber, and there was a general lack of understanding of the work involved with the projects on Plaintiff's part. Plaintiff's reports contained too much insignificant background information and omitted pertinent information. Weber ultimately concluded that Plaintiff should be terminated and made that recommendation to Pezzullo after an at length discussion between Weber and Pezzullo. Based upon Weber's recommendation, Pezzullo recommended to Jay Snyder, the individual with termination authority at the department, that Plaintiff be terminated.

On May 17, 2008, at a meeting with Weber, Pezzullo, and Elaine Heddings, the Human Resources Manager, Plaintiff learned that he was being terminated during the probationary period. Plaintiff was presented with a letter of resignation to sign, in lieu of termination, which Plaintiff signed.

Soon thereafter, in June 2006, Loudoun County prepared another job offer for Plaintiff in hopes that Plaintiff could be employed by the county in a less complex job position with the goal that Plaintiff could develop the requisite skills and be promoted back to his position as Senior Public Works Engineer III. Plaintiff met with Elaine Heddings, Pezzullo, and Weber to discuss

the job responsibilities of that position. Plaintiff declined the job offer of the lower grade position.

**5. Incidents of Discrimination**

There are three potentially discriminatory instances that allegedly occurred between Plaintiff and Foster during the time Foster supervised Plaintiff. In one instance, Foster and Snyder were at the coffee station in Plaintiff's presence and Foster told Snyder in a complaining manner that more than sixty percent of the million dollar houses where Foster lives are owned by Indians and Pakistanis. At the time of the incident, it didn't occur to Plaintiff that it was discriminatory conduct. Instead, only after Plaintiff was terminated did he find the incident to be discriminatory.

Second, Plaintiff states that after Plaintiff accepted the resignation letter he went to the coffee station and Foster was there. After Plaintiff told Foster that he had been terminated, Foster said "[w]hy don't you go back to your own country." (Pl.'s Dep 86:3-10, April 16, 2008). Again, Plaintiff stated that "[a]t that point, [Plaintiff] did not think of it as anything other than a normal conversation." (Pl.'s Dep. 86:6-7, April 16, 2008). Lastly, Plaintiff states that on an average of three time per week, Foster stopped by Plaintiff's cubicle and talked about Muslims and terrorists. Plaintiff stated in his deposition that neither Pezzullo, Weber, nor Heddings discriminated against him. (Pl.'s Dep. 98:1-10, April 16, 2008.).

Importantly, at the time these three allegedly discriminatory instances occurred, Plaintiff did not find any of these interactions to be discriminatory. It is not surprising that Plaintiff didn't think the incidents were discriminatory at the time, because these incidents aren't obviously discriminatory. Once again, it wasn't until after he was terminated that Plaintiff came

up with a "post-thought" that these instances were in fact discriminatory conduct against him. (Pl.'s Dep. 62:7, April 16, 2008).

### III. Summary Judgment Standard of Review

Summary judgment is appropriate when it is apparent from the entire record, viewed in the light most favorable to the non-moving party, that there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Clark v. Alexander*, 85 F.3d 146, 150 (4th Cir. 1996); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court may properly deny summary judgment when there is sufficient evidence favoring the non-moving party that would allow a reasonable jury to return a verdict for that party. *See Anderson v. Liberty Libby, Inc.*, 477 U.S. 242, 255 (1986). However, entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The Court must further grant summary judgment where the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

### IV. Discussion

Generally speaking, there are two ways for Plaintiff to avert summary judgment on his discrimination claim. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004). First, under the "mixed-motive" framework, Plaintiff may establish, through direct or circumstantial evidence, that the adverse employment action was motivated by both legitimate and discriminatory reasons. *See* 42 U.S.C. § 2000e-2(m); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 241 (1989); *Hill,* 354 F.3d at 285. Second, under the "pretext" framework, after

8

Plaintiff establishes a *prima facie* case of discrimination, Plaintiff may demonstrate that the "employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill,* 354 F.3d at 285. Plaintiff establishes a *prima facie* case by showing that "(1) []he is a member of a protected class; (2) []he suffered adverse employment action; (3) []he was performing h[is] job duties at a level that met [his] employers legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by a similarly qualified applicant outside of the protected class." *Hill*, 354 F.3d at 285.

Plaintiff has pursued his discrimination claim under both the mixed-motive and the pretext frameworks. Specifically, Plaintiff asserts that he has presented sufficient direct and circumstantial evidence that even if Plaintiff's performance issues raised by Loudoun County were a motivating factor in the decision to terminate Plaintiff, the decision was illegally tainted by Foster's discriminatory animus towards Plaintiff's national origin.

Turning first to the mixed-motive question, the undisputed evidence of record reveals that neither Snyder, Pezzullo, Weber, Heddings, nor any other person other than Foster, employed by the Loudoun County Department of General Services engaged in any type of discriminatory conduct. Instead, Plaintiff's claim of discrimination is entirely based on Foster's conduct. Plaintiff alleges that Foster engaged in conversations with Plaintiff and others about Muslims and terrorists, spoke in a complaining manner that all of the million dollar homes in his neighborhood were owned by Indians and Pakistanis, and after Plaintiff was terminated by Loudoun County, asked Plaintiff 'why don't you go back to your own country.' At the time each of these comments was made, it did not strike Plaintiff as being a discriminatory or offensive

statement. It was not until after Plaintiff was terminated by Loudoun County that Plaintiff theorized that Foster's comments were discriminatory and that Loudoun County had terminated him based on his national origin. Construing all facts in the light most favorable to Plaintiff, as this Court is bound to do at this stage in the proceedings, the Court accepts Foster's statements as evidence of a discriminatory animus Foster holds against Plaintiff based on Plaintiff's national origin.

Importantly, the Fourth Circuit has specifically "decline[d] to endorse a construction of the discrimination statutes that would allow a biased subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision to become a final decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even if a significant one, in the adverse employment decision." *Hill*, 354 F.3d at 291. Since Foster is the only person accused of discriminatory conduct, the question for this Court is whether Foster possessed such authority so as to be viewed as the one principally responsible for the decision to terminate Plaintiff. *See Hill*, 354 F.3d at 291. The undisputed evidence of record compels the Court to answer this question in the negative.

First, Foster only supervised Plaintiff for a limited period of time, between August 2005 and November 2005. During that time, Foster was temporarily acting as Chief of Design and Construction for Loudoun County until a permanent full time employee was hired. At the end of November 2005, Foster ceased all supervisory responsibilities over Plaintiff and was entirely uninvolved with Plaintiff from that date forward.

During Foster's limited supervision of Plaintiff, Foster made the first record of the positive and negative attributes of Plaintiff's work performance in his December 5, 2005, memo to the file.  Foster observed that Plaintiff had an excellent rapport in the office, but also that Plaintiff's previous work experience wasn't meshing well with the job requirements for his position as a project manager.  After Weber became Plaintiff's full time supervisor, Weber also made note of the same continued problems.  Plaintiff included too much unnecessary background information in his reports and omitted important information.  Plaintiff also continued to have difficulty grasping what work was required to complete the project.  Weber met with Plaintiff to discuss these shortcomings and prepared a detailed memo citing specific examples of problems with Plaintiff's work.  After several more months of deficient work performance, during which Weber had been keeping Pezzullo apprised of Plaintiff's progress, or lack thereof, Weber recommended to Pezzullo that Plaintiff be terminated during his probationary period.  Based on Weber's recommendation, Pezzullo made the same recommendation to Jay Snyder, and without any discussions with Foster, Plaintiff was terminated.

The facts of this case do not present a situation where Foster's discriminatory animus somehow tainted Weber, Pezzullo, or Snyder's decision to terminate Plaintiff.  After Foster prepared the memo to the file addressing what Foster believed were areas of improvement necessary for Plaintiff to secure a full time permanent position with Loudoun County, Foster had no further involvement with Plaintiff's employment at Loudoun County.  For five more months, under different supervision, Plaintiff continued to display the same problems with his work

11

performance and was unable to make the necessary improvements to earn a full time permanent position with Loudoun County.

Further, it is not the case that Foster was so deeply intertwined in Loudoun County's decision to terminate Plaintiff that his discriminatory animus could be imputed to Loudoun County. *See Baqir v. Principi*, 434 F.3d 733, 744-45 (4th Cir. 2006). After Foster wrote the memo to the file in December, Foster had no further comments, recommendations, or observations regarding Plaintiff's work performance. Even if Pezzullo did refer to or rely on Foster's December memo, the facts of this case do not line up with *Baqir*. In *Baqir*, immediately following the Board Meeting at which the decision to terminate the plaintiff was made, a board member integrally involved in the plaintiff's termination stated "that age was the major and only factor for [plaintiff's] discharge." *Baqir*, 434 F.3d at 744. In the present case, Foster's December memo does not say anything about Plaintiff's national origin, and instead it details several of Plaintiff's positive attributes in the work place and notes the areas where Plaintiff needed improvement. Plaintiff has presented no evidence, direct or circumstantial, that Foster's discriminatory comments had any bearing on Plaintiff's termination during his probationary employment period.

Lastly, there is no evidence that Pezzullo and Snyder acted as a "cat's paw" or "rubber stamp" to cover up an illegal discriminatory discharge perpetrated by Foster. *See Hill*, 354 F.3d at 290. Instead, the subordinate employee properly characterized as a decisionmaker, and the individual principally responsible for the termination decision, and from whom liability may be imputed to Loudoun County, is Weber. It is undisputed that Weber has not been accused of harboring a discriminatory animus towards Plaintiff. Accordingly, withholding summary

judgment from Loudoun County for terminating a probationary employee, and wholly in the absence of any discriminatory motivation on the part of the decisionmakers would be improper. *See id.*

Turning next to the pretext framework, assuming for argument's sake that Plaintiff has established a prima facie case of discrimination, and considering Loudoun County's nondiscriminatory reason for the adverse employment action, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." *Hill*, 354 F.3d at 285. Loudoun County's probationary employee policy clearly states that an employee may be terminated at any time during the probationary period and no explanation even need be given. The purpose behind the probationary employee period is for instances such as this, where Plaintiff continued to perform at a level below Loudoun County's expectations and Plaintiff was nearing the end of the probationary period.

The record of evidence is undisputed that Plaintiff got along well with everyone at the Department of General Services, that he and Foster were "coffee buddies," and Loudoun County even offered Plaintiff a lower grade job after his termination in hopes that he could build the skills necessary to eventually become a project manager. Even when the facts are construed in the light most favorable to Plaintiff, there is still a disconnect between Foster's statements and Plaintiff's termination. Plaintiff has not come forward with evidence that would tend to support that Loudoun County's explanation for Plaintiff's termination, which was consistent with Loudoun County's employment policies, was a pretext for discrimination. Based on these facts, no reasonable jury would return a verdict in Plaintiff's favor.

## V.  Conclusion

For the reasons stated herein, Defendants' Motion for Summary Judgment is granted.

ENTERED this 2nd day of July, 2008.

Alexandria, Virginia